**BOWLES, Price Adm'r, v. W. T. GRANT CO.**

District Court, S. D. New York.
Sept. 28, 1944.

774

John D. Masterton, Chief Enforcement Atty., New York Metropolitan Operating Unit, Office of Price Administration, of New York City (Fleming James, Jr., Director, Litigation Division, National Office,

of Washington, D. C., of counsel), for plaintiff.

Katz & Sommerich, of New York City (Maxwell C. Katz and Otto C. Sommerich, both of New York City, of counsel), for defendant.

LEIBELL, District Judge.

The defendant, W. T. Grant Co., moves for a summary judgment dismissing the complaint and vacating a temporary injunction heretofore issued herein.

On August 8, 1943, the OPA filed separate complaints and obtained orders to show cause containing temporary restraining provisions against four of the larger low-price variety retail chain stores—W. T. Grant Co., McCrory Stores, J. C. Penney Company and J. J. Newberry Company. In each case the complaint charged the defendant with selling goods above the maximum prices allowed by Maximum Price Regulation 330. The injunctions in all four suits are identical, enjoining defendants from:

"1. Selling or delivering Women's, Girls' and Children's Outerwear Garments at prices in excess of the maximum prices established by Maximum Price Regulation No. 330;

"2. Doing or omitting to do any other act in violation of said Regulation, as heretofore or hereafter amended; and

"3. Offering, soliciting, attempting or agreeing to do any of the foregoing."

By stipulation, the restraining provisions in the Grant suit were continued as an injunction pendente lite, without prejudice to a motion to vacate; and an order to that effect was entered August 17, 1943.

The affidavits of several OPA personnel on the application for the temporary injunction in the Grant case charged violations of the highest price line limitation—stating that some of the stores in the Grant chain had violated MPR 330 by selling merchandise at price levels for the specified category of garment, which were above the levels carried by the stores during the base period. Maximum Price Regulation No. 330 was intended to govern retailers' and wholesalers' prices for women's outerwear garments. One of the affidavits alleged that 16 of Grant's 493 stores violated the highest price line limitation in 18 categories, resulting in a total "overcharge" of about $11,500. A second affidavit urged the economic necessity of a

highest price line limitation to prevent stores from dropping cheaper lines and taking on more expensive lines. A third affidavit alleged five highest price line violations in one particular Grant store as of May 25, 1943, and annexed a statement from the manager of the store stating that all of the items sold at the higher price lines were items of better style and materials than the items previously carried.

The defendants in the four suits answered the complaints and the answers attacked the method of promulgating MPR 330, the constitutionality of the Emergency Price Control Act, and the constitutionality of the Regulation. On a motion to strike the defenses, Judge Rifkind declared the Act to be constitutional, and ruled out most of the other defenses. He pointed out that the defendants still had other ways of objecting to the Regulation within the OPA and before the Emergency Court of Appeals. D.C., 53 F.Supp. 182. Following this decision, OPA sent interrogatories to the defendants requesting information as to the conduct of their sales in various stores in regard to the "highest price line" regulation. On receiving answers from the defendants in two of the suits, indicating some such violations, OPA moved for summary judgment and permanent injunctions. The motion in the Penney case, Brown v. J. C. Penney Co., D.C., 53 F.Supp. 182, was adjourned by stipulation. The motion for summary judgment and permanent injunction in the McCrory case was denied by Judge Clancy in the following opinion:

"Since the Supreme Court has decided in Brown v. Hecht Company [D.C., 49 F. Supp. 528] that an injunction does not follow automatically from an established violation of the Emergency Price Administrator's regulations or of the statute, it would seem that if an injunction should ever be granted on the facts in this case it could be justified only by demonstrating the character of defendant's conduct to be such as to warrant the imposition of an injunction. This demonstration can be had only by a trial. It is not impossible that the infractions attributed to defendant were not within the spirit of the law. The motion is denied."

By stipulation, the defendant in the Grant suit did not give written answers to the interrogatories, but instead submitted to oral examination. This examination was held on February 9, 10 and 17, 1944. Mr. Seidel, the Comptroller of the Grant Co., was ex-

amined by Atwood Cranston, Esq., Enforcement Attorney of the OPA. The first part of the examination dealt with the instances of highest price line violations cited by Mr. Cranston in his affidavit upon which the order to show cause had issued. The oral testimony was to the effect that in 28 of the 31 instances of violations *alleged in the affidavits,* the OPA was in error as to what had been the highest price line sold during the base period. Further, the Grant Company contended that the statement by the store manager attached to the Administrator's moving affidavits was not reliable, since the manager who signed the report was manager of the store for only two months and did not know what had been sold earlier.

The examination of the defendant Grant was then directed to the 88 questions and 524 alleged violations of the highest price line limitation *specified in the interrogatories.* The Grant Company claimed that it was difficult to find out what actually were the highest prices charged in their separate stores during the base period, because their invoices were kept under the name of the manufacturer who furnished the goods and not under the store to which they were sent, or by the period in which they were sent. For a company receiving ten to twenty thousand invoices a day a complete check on these questions would probably require a great deal of time and labor. Difficulties also were experienced because of the wide differences between the categories defined by the OPA and the categories used by the Grant Company in its business during the base period.

The oral examination was also directed to the reports of the investigators employed by the OPA, and numerous errors were noted. In some instances the investigators could not state definitely whether a specific garment belonged to one OPA category or another, and there were inaccuracies in the investigators' statements of the highest price lines carried by the stores during the base periods.

On June 30, 1944, the Emergency Price Control Act of 1942 was reenacted, but with the following new section (among others):

"Sec. 2(k) No regulation, order, or price schedule issued under this Act shall, after the effective date of this subsection, require any seller of goods at retail to limit his sales with reference to any highest price

line offered for sale by him at any prior time." 50 U.S.C.A. Appendix § 902(k).

The Congressional Conferees report, dated June 20, 1944, stated in reference to the above subsection that "Regulations, orders, or price schedules heretofore issued, insofar as they are inconsistent with this subsection will become inoperative." On July 5, 1944, the Administrator issued Supplementary Order No. 93, effective as of June 30, 1944, when the subsection of the Act became effective. The Administrator's order provided that the highest price line limitations contained in various price regulations (including MPR 330) "should not apply to sellers of garments at retail." The term "seller of goods at retail," used in the statute should be given the meaning properly attributed to it at the time the amendment was passed. The generally accepted definition of a retail seller, or a retailer, is a merchant who sells his goods in small quantities to the ultimate consumer. The OPA General Maximum Price Regulation 1499.20 defined "sale at retail" or "selling at retail" as "a sale or selling to an ultimate consumer other than an industrial or commercial user." And OPA's MPR No. 330 (§ 1389.562) gave the same definition and contrasted "sales at retail" with "sales at wholesale." The Grant stores were sellers of goods at retail when the statute was amended in June 1944. The debate in Congress on the proposed amendment indicates that it was intended to apply to Grant's retail business. There is a sound basis therefore for Grant's contention that its business under MPR 330 came within the scope of the above quoted amendment of the statute.

In support of its motion to dismiss the complaint, made after the June 30, 1944, amendment of the Act, the defendant Grant submitted an affidavit showing that the only issues theretofore raised in this case concerned the highest price line limitations, which are now prohibited by the amendment. From that Grant argued that the issues herein had become moot and that the temporary injunction should be vacated and the complaint dismissed.

The OPA filed an answering affidavit by Mrs. Zarky, the Chief of the Apparel Enforcement Branch, in which she states that at a conference in April 1943 and by subsequent practice, Grant refused to issue pricing charts for use in its stores, based upon the individual experiences of each store. Grant insisted on using a chain-wide pric-

ing chart. No specific instances of wrong pricing is shown as having resulted from the use of the chain-wide pricing chart, but it did not comply with MPR 330, Sec. 1389.-554(f) (1). That subdivision provides that "for the purpose of this regulation each separate department of a selling establishment shall be considered a separate seller." An amendment to said Sec. 1389.554 provided that "In order to price under this regulation, it is necessary to prepare a pricing chart," which was directed to be prepared on or before September 1, 1943. The pricing chart requirement was only partially affected by the June 1944 amendment of the Act, which barred highest price line limitations. The pricing chart is intended to show the ceiling price of any garment sold in the selling establishment. Its usefulness is not limited to a consideration of the "highest price line" limitation. It is a helpful record in determining the proper maximum price for an individual garment, regardless of any highest price line limitation; and it has been retained in a modified form in RMPR No. 330 issued September 13, 1944, to conform the Regulation to the Act as amended June 30, 1944.

In reply, defendant Grant submits an affidavit stating that the issue is still the highest price line violation, and that the reported conference and practices as to the pricing chart are incorrectly stated in the OPA affidavit. Defendant also states that it has fully complied with all of the markup, pricing and record-keeping provisions of MPR 330; that it has prepared a pricing chart for all its stores, which has been followed; that the cost and retail prices are and always have been uniform throughout the defendant's 493 stores.

At the hearing of this motion for summary judgment, counsel for OPA requested the continuance of the injunction, taking the twofold position that the past conduct of W. T. Grant Co. as to the highest price line limitation had been such as to show a wilful and flagrant violation of MPR 330, and that Grant had not kept in proper order the records required by the Regulation. I then requested further affidavits from both sides, on this new issue as to the state of Grant's records. Apparently the uniform pricing chart of the defendant is the basis for the charge that defendant has been guilty of record-keeping violations. Defendant replies that the charge as to improper records is an afterthought and was not raised when the original order to show

cause was obtained with the restraining provisions hereinabove quoted, although plaintiff was then familiar with defendant's record-keeping practices.

The initial supplemental affidavit submitted by Grant states that the first time any question was raised by the OPA as to the sufficiency and propriety of Grant's records was on the present motion; that it prepared a pricing chart and distributed it to its stores before the time required by the regulation; that the chart has since been kept at all of the stores; that because Grant has bought all of its merchandise through its central office, paying uniform prices for them, and because it has put uniform prices on identical merchandise to be sold in its stores throughout the country, a pricing chart prepared from its central office records was proper. Grant admits that all of its stores do not carry all of the merchandise listed on the pricing chart and concludes that the uniform pricing chart simply gave a number of the stores too much information. A copy of the fifteen page pricing chart is attached to Mr. Seidel's affidavit of July 26, 1944. Grant adds that it has been its consistent practice to price its goods below the maximum prices fixed by the OPA regulations.

OPA has filed two additional affidavits in opposition to the defendant's position. The first is by Mr. Forer, the Director of the Apparel and Industrial Materials Enforcement Division of OPA, who states:

"The evidence which plaintiff has obtained reveals violations of the highest price line requirement of MPR 330. It is upon such evidence that plaintiff requests the Court for an injunction."

He then goes on to discuss the pricing chart issued by defendant, and states that a central chart is bad, because: "Such a pricing chart tends to cause mistakes and violations on the ceiling prices of garments".

It should be here noted that where a chain store in a town had not sold a certain type of garment during the base period, its OPA ceiling price for that garment, if sold later, would not be controlled by the price at which the same garment had been sold in some other store of the same chain in another town. For that reason the pricing chart was supposed to be limited to the garments which had been sold in the individual store. The method of calculating the permissible mark-up was different in the case of a garment sold in a specified store during the base period (in which case the pricing chart would be used) from that of a garment not so sold, as explained in Mr. Forer's affidavit of August 5, 1944. A uniform pricing chart covering items not theretofore sold in the store would in that respect be more than mere surplusage; in fact, it could yield itself to improper markups, unless the individual store manager followed the instructions contained in a letter of October 14, 1943, sent to all the Grant stores by Mr. Folger of the home office. Mr. Forer cites two hypothetical cases in which mistakes could occur, and concludes that discussion by saying:

"On the other hand, it is also true that the failure of the uniform chart to reflect accurately the experience of an individual store may result in that store's accepting lower prices than its ceiling on certain items."

No specific instances are given wherein the chart gave rise to higher prices than those otherwise permissible. The director states that they have found individual charts for some of the stores, but there is nothing to show whether the prices thereon were taken from the central pricing chart or represented a new computation of the prices for the individual store.

The second affidavit submitted by the OPA is made by Mrs. Zarky, the Chief of the Apparel Enforcement Branch of the Office of Price Administration. She alleges that in the spring of 1943, shortly after MPR 330 was issued, an investigation showed that 26 of Grant's stores were violating the highest price line limitation and that about 150 specific instances were found. She also states that of the items enumerated in the uniform pricing chart issued by Grant, 16 were found to be over the OPA highest price line limitation, but the instances are not specified. However, "these instances occurred primarily in four categories, in which the chain-wide highest price line was rather low." (There are nearly 500 items listed in the pricing chart.) She also alleges that in April 1943, Grant officials were told that they would have to follow the highest price line limitation of each of their separate stores, and not use the chain-wide highest price line limitation, but that it was not until the decision of Brown v. F. W. Woolworth, D.C., 53 F.Supp. 633, in December 1943, that Grant made any effort to follow the highest price line limitations in its individual stores. Specific instances are

not mentioned for stores following or not following their own individual price lines. The affiant further states that the pricing chart required by MPR 330 was on an individual store basis rather than on a chain-wide basis, and that "recent investigation of some of defendant's stores in May and June of 1944 show that some of defendant's stores still do not have pricing charts computed on an individual store basis." Again specific instances are not given. Mrs. Zarky also quotes from a letter of Grant to its stores to show that Grant wilfully violated the Regulations and she concludes by citing violations of *the highest price line limitation* in 8 stores and in 47 instances found during May and June 1944.

By leave of court, defendant has prepared an affidavit in refutation of the statements contained in the OPA affidavits. It contains matter exhibited to counsel for plaintiff showing that there has been but .54% error above the highest price lines, in pricing the goods from one manufacturer. It states that at the oral examination hereinabove referred to, it was shown that the OPA price limits as set forth in the original moving affidavit of Mr. Cranston to have been in error in 28 out of the 31 items, and that it requested the investigators' reports on the other three items so that further check could be made on that line—but that it has not yet received those reports. Furthermore, it asserts that there are errors in the latest affidavits submitted by the OPA, especially in regard to the violations of the highest price lines alleged to have occurred in May and June of this year. Grant points out that most of those violations occurred in OPA categories 32 to 39 for slacks and slack suits, and it shows the difficulties it encountered in trying to get any action from the OPA so that Grant could purchase that line in advance of the Spring selling season and still plan to be within the OPA requirements. Grant first requested information in November 1943, but it wasn't until April 26, 1944, that the highest price line limitations were announced for those categories. With but two exceptions, the merchandise sold by Grant is well within the prices announced by OPA on April 26th, contained in the press release of OPA of May 31st. The affidavit continues and gives a detailed analysis of errors in the OPA affidavit, which are attributed to the alleged disregard by the OPA of its own published limitations; to the alleged inability of the OPA

investigators to distinguish the merchandise according to OPA classification; and to the alleged citing of incorrect highest price line bases by the OPA investigators. In several specific items Grant denies having sold in 1942 any merchandise in the categories alleged, in the particular store or in any other store.

Attached to the affidavit (in addition to photostats of invoices evidencing the alleged mistakes of OPA in setting the price line bases) there is an exhibit showing the analysis of the prices charged by Grant on the merchandise bought from one manufacturer. On 350,727 garments, with a total retail selling value of $373,236.74, there was found to be a mistake of only .54%. Some 1883 garments were sold for $4,317.07 instead of $3,839.88. On the other hand, Grant sold 121,674 garments at less than the OPA limits—for $228,699.90, instead of $262,629.96 at ceiling prices. Also attached as an exhibit is the complete letter of October 14, 1943, sent by Grant to all of its stores, from which the OPA quoted only a paragraph in its affidavit. The letter was intended to guide the store managers in obeying OPA regulations, and closes—"we must be sure that we do not violate the law in a single instance."

Grant's affidavits and the evidence produced at the oral examination show that the old violations were negligible and never wilful. As for the alleged violations of May and June of this year, Grant has produced invoices showing that, during the base period, Grant has sold the merchandise, in some of the stores cited, at higher base line prices than OPA charges. Other categories with which Grant is charged with violations in May and June of 1944 are categories 32 to 39. These categories were not included in the original MPR 330, but were added by amendment #1 of August 7, 1943. That amendment also includes the provision:

"#1389.552 *How to find your ceiling price under this regulation.*

"(c) *What is the 'base period'?* The base period is very important because you must figure your mark-up from your deliveries of garments during that period.

"(1) *For sales of toddlers' garments, or blouses under size 30, or slacks and slack suits.* The 'base period' for all garments in Category Nos. 5a, 10a, 15a, 20a, 25a, 26a, 26b and 32—39 is the period between (i) August 1 and December 31, 1942 for re-

tailers and (ii) July 1 and October 31, 1942 for wholesalers.

"For retailers who made their first delivery of garments in Category Nos. 5a, 10a, 15a, 20a, 25a, 26a, 26b or 32—39 after October 1, 1942 (September 1, 1942 for wholesalers) but before April 7, 1943, the 'base period' is the first four months immediately following the first delivery of garments."

In Mrs. Zarky's affidavit of August 5th, 1944 she . claims that Grant violated the *highest price line limitation* in categories 32–39, and makes her base line: "Highest March 1942 Price Line or Highest Price line permitted by Amendment 2—MPR 330", of November 25, 1943. (That amendment made no changes in categories 32–39 for slacks and slack suits.) Technically her contention is valid, because the highest price line limitation, as quoted hereinafter, is based on the highest March 1942 price line and Grant had sold in those categories in March 1942 a cheaper grade garment. However, Grant in the Fall of 1943 was selling a higher grade garment in those categories and that leads to an inequitable result. According to one of the pricing rules, the prices on the individual higher grade garments would be legal, because they are the prices found for the higher grade garment by using the base period of August 1 to December 31, 1942, as per Sec. #1389.552 quoted above. Grant has said that its prices are all in accord with such prices for the individual garments, and there has been no denial of that. But OPA claims that Grant nevertheless violated the regulation because these prices are above the *highest price line limitation* for these categories for the type of garment sold by Grant in March, 1942, the period for determining the highest price line limitation, although the higher grade garments in the same categories were not sold by Grant until the Fall "base period", above mentioned. Thus the highest price line limitation of March 1942, the limitation that is supposed to be the top for all the permissible prices in the category, in this case is below the price allowed on individual garments under Sec. 1389.552. The conflicting pricing result seems to remove at least the stigma of "flagrant and wilful violation" on Grant's part, as to these items. This appears to be a situation which the Congressional amendment of June 30, 1944 was intended to correct. Indeed RMPR 330, issued September 13, 1944, re-enacts as Sec.

2, the base period of August 1 to December 31, 1942 for retailers of garments in these categories. (See Fed. Reg., Vol 9, Number 184, page 11351.)

The history of the attempts to revise the highest price line limitations in categories 32–39 is also noteworthy. Amendment 2 to MPR 330, on November 25, 1943 lifted the highest price line limitation in regard to certain low priced items, but the press release said that there was not sufficient information in regard to categories 32–39 to allow any action with respect to them. Immediately Grant, through its Association, tried to find out when such action in those categories could be expected. The affidavits contain and OPA's brief accepts as correct, a telegram of November 28, 1943, and a repeat telegram of December 2, 1943, asking when action might be expected so that stores could buy in accordance with the expected changes. A telegram from OPA of December 6 states:

"RE YR TEL NOVEMBER 26, EVERY EFFORT BEING MADE TO COMPLETE DATA FOR SETTING EXEMPTION LEVELS FOR CATEGORIES 32 THROUGH 39. PRICES WILL BE ISSUED AS SOON AS STUDY IS COMPLETE."

On January 21, 1944, another attempt was made by telegraph to get the new prices, and that telegram had to be repeated on January 26, 1944, before an answer as of February 3 was received stating:

"SURVEY OF DATA FOR SETTING PERMISSIBLE LEVELS FOR CATEGORIES 32 TO 39 ON OUR MPR 287 (SLACKS AND SLACK SUITS) NEARING COMPLETION. WILL ISSUE PRICES AS QUICKLY AS POSSIBLE."

Grant says that during the period of discussion it was given an idea as to what the prices would be, which was corroborated by the press release of April 21, 1944, and especially of May 31, 1944, in which specific prices were announced. The Grant prices are said to be all within the permissible limits of the maximum prices as finally announced. Stores have to plan in advance how they are going to sell their goods. They should be able to learn the permissible retail sales prices before they buy the goods from the manufacturers. In this case, the Association did all it could to get a statement as to what the permissible prices would be. The stores bought in accordance with what they believed would be legal. Be-

cause of the unexplained delay, they are now charged with violating price line limitations which they had been told and publicly promised would be changed.

In addition Grant states that most of the alleged violations in 1943 as charged in Exhibit A of Mrs. Zarky's affidavit are not violations. Grant lists 6 categories in which it had no sales throughout any of its stores in 1942, hence it had no 1942 highest price line such as is listed in the exhibit. Those categories are Numbers 11, 13, 14, 19, 20, 23. That removes 18 of the alleged violations from the exhibits. Furthermore, 13 other alleged violations are removed because one store is included in the affidavit twice. The exhibit attached to the moving affidavit of Atwood Cranston contains mistakes in simple arithmetic (See lines 3, 12, 25 of the column of overcharges.)

The Administrator obtained his power to regulate prices from Section 2(a) of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix § 902(a), which read in part:

"Whenever in the judgment of the Price Administrator (provided for in section 201) the price or prices of a commodity or commodities have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act, he may by regulation or order establish such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act. So far as practicable, in establishing any maximum price, the Administrator shall ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941 * * *."

There was nothing in that provision requiring any highest price line limitation. However, the Administrator deemed it advisable that a limitation to that effect be incorporated into MPR 330. The highest price line limitation in MPR 330 read:

"1389.553 *Explanation of 'highest price line* limitation.' (a) In order that consumers may continue to buy garments at customary price levels, this regulation provides a highest price line limitation, or an overall ceiling rule, for each category number during each selling season. The rule is that during the Spring selling season you may not under any circumstances sell any garments for more than (1) the highest selling price line at which you delivered a garment of the same category number during March

1942, or (2) the price line listed for that category number in Appendix C, whichever is higher; and during the Fall selling season you may not under any circumstances sell any garment for more than (1) the highest selling price line at which you delivered a garment of the same category number either during your base period, or (2) during March 1942, or (3) the price line listed for that category number in Appendix C, whichever is higher."

"(d) If you did not deliver any garments of the same category number during the period which determines your highest price line limitation (March 1942 for the Spring selling season; the base period or March 1942, whichever is higher, for the Fall selling season), then your highest price line limitation is the same as that of your most closely competitive seller of the same class for a garment of that category number during the selling season. Moreover, if your base period does not include the 3 month period between October 1 and December 31 (for wholesalers; the 2 month period between September 1 and October 31), then your highest price line limitation during the Fall selling season is the same as that of your most closely competitive seller of the same class for the same category number during the Fall selling season."

This highest price line limitation soon began to work a hardship on those established retailers who dealt in the cheaper goods. The OPA ruling limited their sales to the cheap lines that they carried during March 1942, while the manufacturers who had supplied them did not have comparable limitations, and were turning their attention to manufacturing garments in the higher price lines. This left the retailer of low-price garments the alternative of abandoning that line entirely or selling at a loss the higher grade garments. OPA recognized that this was the effect of such a limitation and on November 25, 1943 issued Amendment 2 to MPR 330, lifting the limitation in certain cheaper lines. The press release as filed with the Federal Register states:

"To safeguard sale of garments by low-price retail stores, the Office of Price Administration today modified a restriction in its price regulation for women's, girls' and children's outerwear garments.

"The change removes garments sold at or below certain low price levels from the

'highest selling price line' limitation of Maximum Price Regulation 330. Thus wholesalers and retailers will now be allowed to sell garments of specified low price levels, even though these levels may be higher than those of garments they sold in their base periods.

"OPA emphasized that no change is made in the highest price line limitation principle, or its application to outerwear garments sold above the price levels specified in today's action. Nor is any change made in the method of pricing under the five pricing rules of the regulation.

"The action does not raise selling prices of any garment OPA said, and will not increase the cost of living. It merely provides a more nearly equal distribution of garments among stores by permitting low-price stores to handle some of the available supply of merchandise in higher selling price lines than they were permitted to handle before.

"The action relating to low-priced garments was taken, OPA said, because in some instances wholesalers and retailers were not able to obtain garments to be sold at prices as low as those of garments they carried formerly."

It further recognized the difficulties in the press releases of April 26 and May 31, 1944, hereinabove referred to.

Another effect of the "highest price line" limitation was to allow newcomers in the retail field to pick the lines in which they wanted to sell—hence they could enter fields in which there were goods available in the higher grades, whereas the old established firms could not obtain merchandise in the lower grades and were barred from selling in the higher grades.

The Congressional debate on the amendment prohibiting highest price line limitations is contained in pages 5771 to 5781 of the Congressional Record for the 78th Congress (90 C.R. 5771-5781). During the discussion 26 Representatives spoke in favor of the amendment. Most of their argument was directed to the impossibility of retailers obtaining the low-cost goods that were available during the base periods. The limitation had been made by OPA to put pressure on the manufacturers to supply the low-cost field, but the retailers absorbed the pressure. The manufacturers made the more expensive lines, and the low-price retailers could not buy the lines they used to buy. Fifteen of the Representatives cited specific instances in which low-price retailers had been seriously affected or forced out of business by the highest price line limitation. Five Representatives spoke against the amendment. They suggested giving the OPA further chance to straighten out the difficulty. The member who spoke for the Committee on Banking in opposition to the amendment, admitted that the operation of the highest price line limitation was such as to drive the low-price established retailer out of business.

Also read into the Congressional Record (90 C.R. 5771-5773) is the correspondence between the President of W. T. Grant Co. and the Office of the Price Administrator. In September 1943, Grant called to the attention of the OPA the inequity of the limitation, and interviews were had in an effort to get some action on the limitation. Although such action was promised on January 26, 1944, none was forthcoming from that time on. The history of personal interviews and letters there set forth excludes any other than an orderly and legal attempt by Grant to get the limitation removed.

The record shows that Grant did its best to follow the OPA regulations, while at the same time it objected strenuously to the regulations. The distinction between complying with the OPA regulations and striving to get changes to make them practicable is borne out by the two sets of correspondence noted above. There is no parallel between Grant's conduct in this case and the conduct of Montgomery Ward, as recited in Bowles v. Montgomery Ward & Co., 7 Cir., 143 F.2d 38. The fact that Grant took its objections to Congress before it received any action on this price line limitation is not to be held against it. "The historic injunctive process was designed to deter, not to punish." Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 592.

The OPA asks that the broad scope of the injunction pendente lite be retained. In my opinion the three paragraphs thereof were too extensive in scope when issued and might have been modified if defendant had moved for that relief at the time.

The provision of the Act, relating to the issuance of an injunction, is contained in Section 205 of the Act, 50 U.S.C. A. Appendix § 925:

"205 Enforcement.

"(a) Whenever in the judgment of the Administrator any person has engaged or

is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond."

Since the injunction is to be granted upon a showing of "acts or practices" in violation of the Act, the terms of the injunction are properly limited to "such acts or practices." The Circuit Court of Appeals for this Circuit has so held. Henderson v. Burd, 2 Cir., 133 F.2d 515, 146 A.L.R. 714. This is in line with N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. Furthermore, this Court has denied application for too broad an injunction, in many cases. Bowles v. Fischer & Co., 1 Price Control Cases 51,027; Bowles v. Tailored Silk Undergarment Co., 1 Price Control Cases 51,028; Brown v. Sacher, D. C., 53 F.Supp. 77; Brown v. Cantor, 1 Price Control Cases 51,046; Brown v. Buchsbaum, 1 Price Control Cases 51,044; Brown v. Sonnenshein, 1 Price Control Cases 51,037. The present case and its three companion cases are similar to the case of Brown v. Sacher, supra.

The OPA contends that the June 30, 1944 amendments to the Emergency Price Control Act of 1942 (The Stabilization Act of 1944) permit such a broad injunction, quoting:

"Notwithstanding the provisions of this paragraph, in the case of a proceeding under section 205(a) the court granting a stay under this paragraph shall issue a temporary injunction or restraining order enjoining or restraining, during the period of the stay, violations by the defendant of any provision of the regulation, order, or price schedule involved in the proceeding." (Section 107, Stabilization Extension Act of 1944, 50 U.S.C.A. Appendix § 924).

The "stay under this paragraph" however refers to stays in enforcement suits pending hearings in the Emergency Court of Appeals (under § 204) on the validity of the regulations involved in the suit. That is not the situation here presented. Further, § 108 of the June 1944 Act does not amend subdivision (a) of § 205 of the 1942

Act, although it does amend other subdivisions thereof.

It was admitted on the argument that paragraph 1 of the injunction, which would include adherence to a highest price line limitation, is to that extent no longer binding, since the June 30, 1944 amendment. The OPA requests, however, that the present broad injunction be retained because Grant's violation of the highest price line limitation was wilful and flagrant, while that limitation was in effect. There has been no other maximum price violation alleged, shown or inferred.

Paragraph 2 of the temporary injunction was always too broad in its scope; it did not specify the act or acts enjoined. Paragraph 3 was likewise defective.

The disposition of this motion is within the sound discretion of the Court (Hecht Co. v. Bowles, supra). The present injunction pendente lite will be vacated. But the complaint will not be dismissed. The OPA may wish to amend the complaint at some future date, if it can then show any violations by the defendant Grant of MPR 330, as amended September 13, 1944. I have in mind in particular the requirement for a separate price chart for each store, unless the chain seller has received an order from the OPA "authorizing uniform pricing." (Sec. 3 as to Pricing Charts.)

If this defendant fails to comply with RMPR 330, issued September 13, 1944, the plaintiff may renew its motion in this action for an injunction pendente lite, to compel the defendant to comply.

Price control is an essential part of our economic life under war conditions. The difficulties encountered in preparing Regulations that will fully cover the situation, in both the wholesale and retail fields, must be tremendous. Those charged with that responsibility in the OPA have had a thankless task. They are entitled to the wholehearted cooperation of the various industries. Wilful violations of OPA regulations will be enjoined by the Courts. Bowles v. Montgomery Ward & Co., supra.

It is because I believe that the defendant, W. T. Grant Co. is willing to cooperate and has been making a sincere effort in that direction, that I have concluded that the injunction herein should not be continued and that no new injunction should be issued at this time, because of Grant's use of a uniform pricing chart instead of individual

charts in its 493 stores. No harm has been done thereby to the purchasing public. But the Regulation (RMPR 330) is against the use of a uniform pricing chart by chain stores unless specifically permitted by an OPA order. The defendant should apply for such permission and avail itself of the remedies provided by the Act and the Regulations.

The motion to vacate the temporary injunction is granted. The motion to dismiss the complaint is denied. Submit a proposed order on two days' notice.